| | |
|---|---|
| WESTERMAN BALL EDERER MILLER<br>   & SHARFSTEIN, LLP<br>1201 RXR Plaza<br>Uniondale, New York 11556<br>(516) 622-9200<br>John E. Westerman, Esq.<br>Mickee M. Hennessy, Esq. | Hearing Date: August ___, 2010<br>Time:  ___:___  _.m. |

*Proposed Counsel for Brisam Covina LLC,*
*Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:

BRISAM COVINA LLC,

                    Debtor.
---------------------------------------------------------X

Chapter 11

Case No.:  10-76441 (REG)

**AFFIDAVIT OF SAM CHANG, MANAGER OF**
**BRISAM COVINA LLC IN SUPPORT OF FIRST DAY MOTIONS AND**
**IN COMPLIANCE WITH RULE 1007-4 OF THE LOCAL BANKRUPTCY RULES**

STATE OF NEW YORK    )
                              ) ss:
COUNTY OF NASSAU    )

        SAM CHANG, being duly sworn, deposes and says:

        1.    I am the sole manager and member of Samtel, LLC, a New York limited liability company, which in turn is the sole manager and member of Brisam Covina LLC ("Debtor"). Based on the reports I receive from the accounting department, I have knowledge of and am familiar with the day-to-day operations, business and financial affairs and books and records of the Debtor. With respect to certain financial information set forth herein, I have relied on information provided by the Debtor's accounting department and the third-party management company retained by the Debtor. With respect to pending legal matters, I have relied upon the advice and counsel of the Debtor's attorneys and other professionals.

2.  I submit this Affidavit (the "Affidavit") in support of the Debtor's voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C.§§ 101, *et. sec.* (as amended, the "Bankruptcy Code"); the first day applications and motions filed contemporaneously with the Petition (the "First Day Motions"); and pursuant to Rule 1007-4 of the Local Rules of Bankruptcy Procedure for the Eastern District of New York (the "EDNY LBR").

3.  Any capitalized term not defined herein shall have the meaning ascribed to such term in the relevant First Day Motions.

4.  Except as otherwise noted herein, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Affidavit.

5.  Unless otherwise indicated, the financial information set forth in this affidavit is unaudited.

## Background

6.  On August 17, 2010 (the "Filing Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York.  No trustee, examiner or committee of unsecured creditors has as yet been appointed, and the Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.  The Debtor is a Delaware limited liability company that maintains a principal place of business in Great Neck, New York.  The Debtor's books and records and senior management are also located in Great Neck, New York.  The Debtor's business consists of owning and

operating a hotel and conference center in Covina, California, which operates as the "Radisson Suites Hotel Covina" (the "Hotel"). The Debtor owns the real property on which the Hotel is situated, located at 1211 East Garvey Street, Covina, California (the "Hotel Real Property").

8. The Hotel is approximately 63,431 square feet and is situated on approximately 5.5 acres of land. The Hotel consists of a complex of two (2) and three (3) story buildings, including a lobby, 259 guest suites, various amenities such as an outdoor swimming pool, jacuzzi, courtyard, health and fitness center, and other recreational amenities, including over 9,000 square feet of meeting space, an elegant ballroom and several meeting rooms. The Hotel also leases space to the Hamilton Steakhouse, a restaurant and dedicated lounge/bar. The Hotel is located near Disneyland and is only fifteen (15) minutes from the Ontario International Airport.

9. Based upon the current real estate market, the Debtor owns assets with an estimated cumulative value of approximately $15 million. However, as discussed below, if the Debtor is given the opportunity as planned to convert the hotel to a Holiday Inn, the value of the Debtor's assets will increase to $20-$22 million. This is based on, among other things, brand value of the franchise and my experience operating other comparable hotels, along with the fact that there is not a competing Holiday Inn in the relevant vicinity.

10. The Debtor's Sole Member and Manager is Samtel LLC, a New York limited liability company. I am the sole Member and Manager of Samtel, LLC and, as such, through Samtel, LLC I make all of the major decisions for the Debtor.

11. The Debtor has a third-party property management agreement (the "Management Agreement") in place with Packard Hospitality Group, LLC, a California limited liability company ("Packard"), pursuant to which Packard manages the Hotel and provides administrative functions in order to facilitate the operations of the Hotel. I am engaged in the acquisition, development,

operation and sale of hotel properties nationwide. Over the course of the past several years I have operated, and continue to operate, several Radisson and Holiday Inn franchises across the nation. On occasion, I am engaged in the operation of hotels that are being developed or renovated prior to sale.

12. Currently, through the Management Agreement with Packard, there are approximately 49 employees being employed at the Hotel, consisting of approximately 43 hourly employees and 6 salaried employees. As part of the course of business, the Debtor periodically makes payments to Packard which, among other things, pays payroll to the individual employees working at the Hotel, in accordance with an annual budget.

13. The Debtor presently operates the Hotel pursuant to a License Agreement with Radisson Hotels International, Inc., a Delaware corporation.

**Events Leading To Bankruptcy Filing**

    **A.**    **The Loan Transaction**

14. In February 2007, the Debtor acquired the Hotel and the Hotel Real Property pursuant to a "reverse 1031 exchange." In consideration of this acquisition, the Debtor entered into a promissory note/line of credit in an amount up to $17.3 Million, with an initial funding of $14.3 Million and future advances of up to $3 Million.

15. The Debtor financed the purchase of the Hotel and the Hotel Property with a first mortgage loan from Ixis Real Estate Capital, Inc., predecessor to Natixis Real Estate Capital, Inc. and/or Natixis Real Estate Capital, LLC, (the "Lender") in the original principal amount of $17,300,000 as evidenced by, among other documents, (i) that certain Promissory Note dated as of February 1, 2007; and (ii) that certain Loan Agreement dated as of February 1, 2007 (collectively with the documents executed and delivered by Debtor in connection with the loan transaction, the

"Loan Documents"). Upon information and belief, Lender is asserting that it is presently owed approximately $19 Million, including default and non-default interest and attorneys' fees.

16. In connection with the Loan, I executed and delivered a Guaranty of Recourse Obligations dated as of February 1, 2007 (the "Guaranty").

### B. Renovation After the Loan Transaction

17. After the Debtor purchased the Hotel and the Hotel Real Property, the Debtor and affiliates invested approximately $5 Million for improvements and renovations to the Hotel. At the time of purchase, the Hotel derived much of its revenue from corporate and business clientele, along with travel and leisure customers. Shortly after the acquisition, however, as a result of economic downturn and interruption from initial necessary renovations, the Hotel lost a large amount of its corporate business, which was historically the more profitable arm of the Hotel. The general economic slowdown has negatively impacted leisure use as well.

18. In addition, in or around April 2008, the Lender caused interference and delay in the timely payment of certain operating expenses. This occurred at a crucial time, exacerbating business interruptions that damaged the Hotel's reputation among its corporate clients.

19. In or around January 2009, the Debtor approached the Lender to discuss restructuring the loan. the Debtor attempted to restructure the outstanding indebtedness due to the Lender by making a good faith payment of $500,000.00 along with paying a requested restructuring fee to the Lender of $43,000.00. The Hotel has since focused on rehabilitating itself for corporate use and has operated primarily on travel and leisure use, which is less profitable. Recently, the Hotel has seen an uptick in both corporate and leisure occupancy, and has one of the higher occupancy rates as compared with other comparable hotels in the area. In addition, the Debtor has been exploring

an alternative franchise arrangement with Holiday Inn, which the Debtor believes would be a uniquely successful hotel franchise at the Hotel Property.

20.   The Debtor's bankruptcy filing was precipitated by, among other things, the current economic recession, coupled with the extensive renovations to the Hotel, both of which caused the Debtor to experience a decline in its occupancy rates and revenue stream. The corresponding reduction in cash flow left the Debtor unable to meet all of its debts as they came due which resulted in commencement of a foreclosure action by the Lender. Just, recently, the Lender advised the Debtor that it was applying the $500,000 to the outstanding indebtedness and returned the restructuring fee to the Debtor, without any discussion of meaningful restructuring or another amicable resolution. In the context of a mandatory settlement conference in pending litigation with the Lender, the Debtor has made a meaningful settlement proposal which, to date, has been rejected by the Lender without a reasonable alternative.

21.   The Debtor seeks the breathing spell of the bankruptcy process in order to, *inter alia*, stabilize its room revenues, which have been increasing, and ultimately to sell, refinance or convert the Hotel into a Holiday Inn as planned, and utilize the proceeds to pay a maximized return to all creditors, including the Lender. As previously indicated, it is anticipated that the value of the Debtor's assets will increase substantially, to approximately $20 - $22 Million, once the conversion to a Holiday Inn is complete. This is projected based upon, among other things, my experience with other comparable Holiday Inn franchises currently being operated across the nation and the lack of a comparable competing franchise in the vicinity.

## First Day Motions

22. On the Filing Date, the Debtor filed the following First Day Motions requesting various forms of relief necessary to enable the Debtor to continue its operations and otherwise assist in administration during the pendency of this Chapter 11 case. The First Day Motions are as follows:

  i.   Motion for the Entry of an Order (A) Scheduling An Expedited Hearing on First Day Motions and Applications Filed by the Debtor and (B) Approving the Form and Manner of Notice (the "Expedited Hearing Motion");

  ii.  Motion Of Debtor For Order Under 11 U.S.C. §§ 105, 345, 363, 1107 And 1108 Authorizing (I) Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Business Forms, (III) Continued Use Of Existing Cash Management System, And (IV) Limited Waiver Of Section 345(B) Deposit And Investment Requirements (the "Cash Management Motion");

  iii. Motion Pursuant To Bankruptcy Code Sections 105(a) And 363(b) For Order Authorizing The Debtor To Reimburse Packard Hospitality Group, LLC For Critical Operating Expenses Incurred On Debtor's Behalf Prior To The Filing Date (the "Critical Operating Expense Motion");

  iv.  Application For Entry Of An Order (A) Authorizing Debtor To Use Cash Collateral On An Emergency Basis; (B) Scheduling Preliminary And Final Hearings On Debtor's Use Of Cash Collateral; (C) Granting Adequate Protection; and (D) For Related Relief (the "Cash Collateral Motion"); and

  v.   Motion Of The Debtor For An Order Under Section 366 Of The Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service, (B) Deeming Utilities Adequately Assured Of Future Performance, and (C) Establishing Procedures For Determining Adequate Assurance Of Payment (the "Utility Motion").

23. I believe that granting the relief requested in each of the First Day Motions is vital to the Debtor and necessary to maintain the going concern value of the Debtor's operations. Further, I believe that each of the First Day Motions is in the best interests of the Debtor, its creditors, vendors, customers and other parties in interest. Taking each First Day Motion in turn, I support the entry of orders granting the relief requested therein.

**Expedited Hearing Motion**

24. The Expedited Hearing Motion requests the entry of an order authorizing the scheduling of an expedited hearing on the First Day Motions and applications filed by the Debtor.

25. An expedited hearing is essential to maintaining the viability of the Debtor's business and preserving the Debtor's ability to reorganize successfully. Even a brief disruption to the essential operations of the Debtor's Hotel, including payment to the individual employees and service providers -- particularly in this highly competitive service business -- will cause irreparable harm to the Debtor's business. Accordingly, the Debtor believes that the First Day Motions involve matters that require an expedited, emergency hearing and request that the Court schedule such a hearing on all the First Day Motions to be conducted on the Filing Date or as soon as practicable thereafter.

**Cash Management Motion**

26. The Cash Management Motion requests the entry of an order authorizing the Debtor to maintain its existing bank accounts and to continue to use its existing Cash Management System during the pendency of the Chapter 11 case. Continuing the Debtor's Cash Management System without interruption is also imperative to the success of this Chapter 11 case.

27. The Debtor's Cash Management System constitutes a customary and essential business practice and was created and implemented by the management of the Debtor in the exercise of its business judgment. The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtor in size and complexity. The widespread use of this type of Cash Management System derives from the numerous benefits it provides, including the ability to (a) control and monitor corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds and the

development of timely and accurate balance and presentment information. In addition, it is particularly important for this Debtor to preserve a "business as usual" atmosphere and avoid the unnecessary and potentially irreparable harm resulting from distractions that would inevitably be associated with a substantial disruption of the Cash Management System.

28. The Cash Management Motion also requests that the Debtor be permitted to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.), as well as checks, subject to such forms and checks being stamped or modified to refer to Debtor's "debtor in possession" or "DIP" status. Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's reorganization efforts, particularly since the Debtor intends to modify the forms to note that the Debtor is a "debtor in possession" or "DIP".

29. Further, the Cash Management Motion respectfully requests relief from the strict compliance with section 345(b) of the Bankruptcy Code, including the requirement for the posting of a bond. The Debtor does not maintain any non-cash investments and transacts its business through cash, check, and debit and credit card receipts.

**Critical Operating Expense Motion**

30. The Critical Operating Expense Motion seeks entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Bankruptcy Rule 6003(b), authorizing the Debtor, in its discretion, to reimburse Packard the funds necessary for Packard to pay amounts due to critical services providers – *i.e.* the employees at the Hotel – incurred on behalf of the Debtor prior to the Filing Date. As discussed below, Packard manages the Debtor's primary asset, the Hotel; Packard employs approximately [49] individuals who provide various essential services to the Hotel. Without the payments made by the Debtor to Packard described herein, the Debtor faces the

prospect that the day-to-day employees at the Hotel will not be paid. They may walk out, with services and amenities for the Hotel's patrons frozen, all risking permanent damage to the Hotel's operation and reputation. It is therefore vital to the Debtor that the Hotel services, including seamless payment of employees, remain uninterrupted. In an interruption of payments to the many individual employees will likely cause such individuals hardship, and irreparable harm to the Debtor's business. The only pre-Filing Date amounts sought to be paid to Packard by this Motion are those that are necessary to cover the employees' payroll.

## Cash Collateral Motion

31. In the Cash Collateral Motion, the Debtor seeks the issuance and entry of an Order, pursuant to Section 363(c) of the Bankruptcy Code and Bankruptcy Rule 4001(b), granting the Debtor preliminary and final authority to use any alleged cash collateral of Natixis Real Estate Capital, Inc. (including its successors and/or assigns "Lender") in the amounts and for the purposes stated, and for the duration set forth in the budget attached to the motion as "Exhibit A;" scheduling preliminary and final hearings on the Debtor's request for permission to continue to use its cash, inventory and other assets in the ordinary course of its business as more fully defined in the Cash Collateral Motion, the ("Cash Collateral") and granting the Debtor authority, either on consent pursuant to Section (c)(2)(A) of the Bankruptcy Code, or absent consent, pursuant to Section 363(c)(2)(B), for continued use of Cash Collateral.

32. The Debtor submits that the party alleging secured interests in the Cash Collateral is adequately protected against any diminution in value by sufficient equity of the Cash Collateral in excess of the Debtor's obligations.

33. As set forth in the budget annexed to the Cash Collateral Motion, the Debtor projects that its weekly operating expenses for the thirty day period following the filing will total

approximately $272,000. These expenses include, among other things, accounts payable incurred in the ordinary course of business, payroll, advertising, utilities and insurance. As predicted in the Budget, the Debtor expects to operate with a positive cash flow during the majority of this period.

34. Further, among other reasons, the expenses anticipated by the Debtor aggregating $272,000 is less than the anticipated revenue for the same period, of $283,802 and the use of these monies will maintain and maximize the value of the Debtor as a going concern. Therefore, it is submitted that the Lender is "adequately protected" by replacement liens on the Debtor's post-filing cash collateral.

35. In the absence of the approved use of Cash Collateral, the Debtor would be unable to operate and would be forced to close its business, thereby eradicating any possibility of a successful reorganization. Because the Debtor has no source of funds to satisfy its ongoing operations, other than Cash Collateral, the Debtor has a critical and immediate need to use Cash Collateral.

36. The Court's authorization of the Debtor's continued use of Cash Collateral will benefit all creditors by minimizing disruption of the Debtor's business and enabling the Debtor to commence its reorganization efforts. Accordingly, the Debtor requests that the Court authorize the continued use of Cash Collateral pursuant to Section 363(c)(2) of the Bankruptcy Code and Bankruptcy Rule 4001(b).

**Utility Motion**

37. The Utility Motion respectfully requests entry of an order (a) prohibiting the utility providers (collectively, the "Utility Providers") from altering, refusing or discontinuing service; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for determining additional adequate assurance of future payment.

38. The Debtor cannot continue to operate without utility services. If any of the Utility Providers alters, refuses or discontinues service, even for a brief period, the Debtor's business operations would be severely disrupted and irreparably harmed. Such disruption would have a devastating impact on the Debtor's business operations, revenues and ultimately affect the Debtor's ability to reorganize. In contrast, the Utility Providers will not be prejudiced by the continuation of services and will be paid all postpetition utility charges. It is therefore critical to the Debtor and for the benefit of the estate's creditors that utility services continue uninterrupted.

39. To provide adequate assurance of payment for future services to its Utility Providers, the Debtor proposes to deposit a sum equal to 50% of the Debtor's estimated cost of its monthly utility consumption, or $17,639.00, into a segregated interest-bearing sub-account (the "Utility Deposit Account") within 20 days after the entry of an order granting the Utility Motion, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment for post petition date services provided to the Debtor.

40. In addition, the Debtor seeks to establish reasonable procedures (the "Procedures") by which Utility Providers may request additional adequate assurance of future payment, in the event that Utility Providers believe that the Utility Deposit Account does not provide them with satisfactory adequate assurances. The proposed form of Order also allows the Debtor to supplement the list of Utility Providers pursuant to certain established procedures.

41. The Debtor thus proposes to establish a Utility Deposit Account in order to provide adequate assurance to its Utility Providers. Under the circumstances of this case, the Debtor believes that the establishment of this cash reserve, relative to the Debtor's estimated monthly consumption, constitutes adequate assurance of payment under section 366(c) of the Bankruptcy Code.

42. Finally, the Debtor proposes to protect the Utility Providers further by establishing certain Procedures whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to the Debtor that would merit greater protection.

**Reservation of the Debtor's Right to Seek**
**Extension of The Automatic Stay or Injunctive Relief**

43. In addition to the foregoing, the Debtor and I, in my capacity as a guarantor of the Debtor's indebtedness to the Lender, are defendants in a certain pending action commenced by the Lender, titled *Natixis Real Estate Capital Inc. v. Brisam Covina LLC, et al.,* Case No. BC420293 (California Superior Court, Los Angeles County 2009) (the "Foreclosure Action"). The Lender has represented that, upon the filing of the Debtor's petition, Lender consents to extension of the automatic stay provisions of 11 U.S.C. §362 to me for purposes of the Foreclosure Action, without prejudice to Lender's right to seek relief from the automatic stay as against me or the Debtor at any time.

44. The Debtor in turn reserves the right to seek, among other things, declaratory relief extending the automatic stay provisions of 11 U.S.C. §362, or alternatively, preliminary injunctive relief pursuant to 11 U.S.C. §105(a), staying or otherwise enjoining Lender from continuing to prosecute the Foreclosure Action, pending the Debtor's efforts to reorganize.

**Compliance with Rule 1007-4 of the Local Bankruptcy Rules**

**E.D.N.Y. LBR 1007-4(a)(i) and (ii)**

45. A description of the nature of Debtor's business operations and the circumstances leading up to the Debtor's filing under Chapter 11 is contained herein at the section entitled "Background". The Debtor is not a small business debtor within the meaning of Bankruptcy Code §101(51D).

**E.D.N.Y. LBR 1007-4(a)(iii)**

46. This case was not originally commenced as a Chapter 7, Chapter 12 or Chapter 13 case and no trustee has been appointed in the case.

**E.D.N.Y. LBR 1007-4(a)(iv)**

47. To the best of my knowledge, no unofficial creditor or other committees were formed in connection with the Debtor's Chapter 11 case prior to its commencement.

**E.D.N.Y. LBR 1007-4(a)(v)**

48. A list containing the names, addresses and the amounts of the claims of the Debtor's twenty (20) largest known non-insider, general, unsecured creditors, was filed today with the Debtor's petition and designates which claims are disputed, contingent or unliquidated. To the best of my knowledge, none of the claims listed on that schedule are partially secured.

**E.D.N.Y. LBR 1007-4(a)(vi)**

49. Debtor's only alleged secured creditor, the Lender, has a claim which is disputed by the Debtor. The amount of the claim and a brief description and estimate of the value of the collateral allegedly securing the claim, is set forth above. The Debtor reserves its rights to dispute the amount and/or secured status of this claim.

**E.D.N.Y. LBR 1007-4(a)(vii)**

50. A summary of the Debtor's assets and liabilities on an unaudited basis as of this Petition will be filed with the Debtor's schedules.

**E.D.N.Y. LBR 1007-4(a)(viii)**

51. To the best of my knowledge, there are no classes of shares of stock, debentures, or other securities of the Debtor that are publicly held.

**E.D.N.Y. LBR 1007-4(a)(ix)**

52. To the best of my knowledge, there is no property of the Debtor in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

**E.D.N.Y. LBR 1007-4(a)(x)**

53. The Debtor operates from offices owned by its affiliate, Brisam Great Neck, LLC, located at 420 Great Neck Road, Great Neck, New York.

**E.D.N.Y. LBR 1007-4(a)(xii)**

54. The Debtor's books and records are maintained at its principal place of business at 420 Great Neck Road, Great Neck, New York. The Debtor holds no assets outside the territorial limits of the United States.

55. The Debtor's books and records and principal place of business are located in Great Neck, New York.

**E.D.N.Y. LBR 1007-4(a)(xii)**

56. A list identifying each action (pending or threatened) against the Debtor or its properties where a judgment or a seizure of its property may be imminent will be filed with the Debtor's schedules.

**E.D.N.Y. LBR 1007-4(a)(xiii)**

57. The names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of the relevant responsibilities and experience will be filed with the Debtor's schedules.

**E.D.N.Y. LBR 1007-4(a)(xiv)**

58. The estimated amount of the payroll to the employees at the Hotel (which do not include any officers, directors, members, stockholders, and partners of the Debtor) for the thirty (30) day period following the filing of this Chapter 11 case is approximately $116,000.

**E.D.N.Y. LBR 1007-4(a)(xv)**

59. The Debtor is a for-profit company. The Debtor estimates that for the thirty (30) day period following the commencement of its Chapter 11 case, there will be $116,000 paid for payroll, including fees, salaries and other compensation for the Debtor's executive officers. The Debtor has retained no financial or business consultants.

**E.D.N.Y. LBR 1007-4(a)(xvi)**

60. The estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and any other information relevant to the foregoing, a schedule setting forth, for the thirty (30) day period following the filing of the Chapter 11 petition is attached to the Cash Collateral Motion as Exhibit "A".

**Conclusion**

61. To preserve the value of its business, the Debtor's immediate objective is to maintain operations following the Filing Date, so its business can be conducted on an ongoing and uninterrupted basis and, so that the value of the Hotel can be maximized. For the reasons described in this Affidavit, I believe that the achievement of these objectives is in the best interests of the Debtor, its creditors, and all parties in interest. Accordingly, I believe that granting the relief requested in the First Day Motions is in the best interests of creditors, the Debtor's estate and all parties in interest in this Chapter 11 case.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

                                                   */s/ Sam Chang*  
                                                   Sam Chang

Sworn to before me this  
17th day of August, 2010

/s/ *Florence Jean-Joseph*  
NOTARY PUBLIC, State of New York  
No. 41-5010171  
Qualified in Queens County  
Commission Expires 9/18/2013